UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PNC BANK, National Association,

                Plaintiff,

v.

SELECT COMMERCIAL ASSETS,
LLC and ALL OCCUPANTS OF
32102 DI STEFANO CT, FRASER, MI
48026,

                Defendants.
_____/

Case No. 18-cv-10711

Paul D. Borman
United States District Judge

Anthony P. Patti
United States Magistrate Judge

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART BOTH PARTIES'**
**MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 21 and 22)**

**INTRODUCTION**

This case arises out of a series of mortgages placed on 32102 Di Stefano Ct., in

Fraser, Michigan. Plaintiff PNC Bank argues that it is entitled to foreclosure on this

property under future advance mortgages created in 2001 and 2003. It also argues

that is entitled to reimbursement for tax and insurance payments that it has made to

protect its interest in the property. Defendant SCA disagrees, and also argues that it

is entitled to summary judgment on the basis of res judicata.

The Court finds that the briefing adequately addresses the issues in contention

and dispenses with a hearing pursuant to E.D. Mich. L. R. 7.1(f)(2).

# I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

## A. Statement of Facts

### December 2001: National City Bank loans Ercole and Joanne Di Stefano $45,000, secured by a future advance mortgage on the Property.

On December 20, 2001, Ercole and Joanne Di Stefano granted a future advance mortgage (the "2001 HELOC[1]") on 32102 Di Stefano Ct., in Fraser, Michigan ("the Property"), to National City Bank ("NCB"), to secure repayment of a line of credit with a "maximum principal amount" of up to $45,000. (ECF No. 22-2, PageID 660.) The 2001 HELOC also secured "[a]ll future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt executed by Mortgagor in favor of Lender executed after this Security Instrument whether or not this Security Instrument is specifically referenced." (ECF No. 22-2, PageID 661.)

The 2001 HELOC further provided that "Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due" and "shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location." (ECF No. 22-2, PageID 661–62.) Additionally, it provided that, "[i]f Mortgagor fails to perform any duty or any of the

---

[1] 'HELOC" stands for "home equity line of credit."

covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed," and that, "[e]xcept when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument." (ECF No. 22-2, PageID 661–62).

The 2001 HELOC also provided that "the duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender." (ECF No. 22-2, PageID 663.)

The 2001 HELOC was recorded with the Macomb County Register of Deeds on January 15, 2002. (ECF No. 22-2, PageID 660.)

**December 2001 – November 2002: National City Mortgage Services Co. twice loans the Di Stefanos $240,000, both secured by mortgages on the Property.**

On December 20, 2001, National City Mortgage Services Co. ("NCMSC") loaned the Di Stefanos $240,000, and secured this loan with a mortgage on the Property. (ECF No. 21-2.) This Mortgage was recorded with the Macomb County Register of Deeds on January 15, 2002. (ECF No. 21-2.)

On November 8, 2002, NCMSC lent the Di Stefanos another $240,000, and secured this loan with another mortgage on the Property. (ECF No. 22-12.) This loan was used to pay off the 2001 loan from NCMSC. (ECF No. 22-18, PageID 935.) The Mortgage was recorded with the Macomb County Register of Deeds on November 25, 2002. (ECF No. 22-12, PageID 795.)

**January 2003: NCMSC's 2002 Mortgage is discharged.**

On January 15, 2003, the Macomb County Register of Deeds entered a Satisfaction / Discharge of NCMSC's 2002 Mortgage on the Property. (ECF No. 22-13.) This Discharge was signed by the vice president of NCMSC.[2] (ECF No. 22-13.)

**February 2003: NCB loans the Di Stefanos $44,000, secured by a new future advance mortgage on the Property.**

On February 5, 2003, the Di Stefanos granted another future advance mortgage (the "2003 HELOC") on the Property to NCB, this time to secure repayment of a line of credit with a principal amount of up to $44,000. (ECF No. 22-7.) The 2003 HELOC's terms were identical to those of the 2001 HELOC. (ECF No. 22-7.) This HELOC was recorded with the Macomb County Register of Deeds on March 20, 2003. (ECF No. 22-7, PageID 773.)

**November 2004 – December 2006: Warren Bank loans the Di Stefanos $800,000 and $150,000, both secured by mortgages on the Property.**

On November 18, 2004, Warren Bank ("WB") lent the Di Stefanos $800,000, and secured this loan with a mortgage on the Property. (ECF No. 21-7; ECF No. 22-8.) This Mortgage also secured "[a]ll obligations . . . whether now existing or hereafter arising" of the Di Stefanos to WB. (ECF No. 22-8, PageID 742.) And it

---

[2] The Discharge identified the 2002 Mortgage by Liber and Page numbers, demonstrating that that was the Mortgage to which it applied, even though it misstated that Mortgage's date of execution as December 20, 2001. (ECF No. 22-16, PageID 825.)

provided that it would "be binding upon and inure to the benefit of the parties, their successors and assigns." (ECF No. 22-8, PageID 750.) The Mortgage was recorded with the Macomb County Register of Deeds on November 24, 2004. (ECF No. 22-8, PageID 742.)

On March 14, 2006, WB lent the Di Stefanos another $60,000, again secured with a mortgage on the Property. This Mortgage had the same terms as WB's 2004 Mortgage. (ECF No. 22-9, PageID 763.) It was recorded with the Macomb County Register of Deeds on March 24, 2006. (ECF No. 22-9, PageID 755.)

On December 5, 2006, WB's 2006 loan was increased to $150,000. (ECF No. 21-9, PageID 329.) This change was recorded with the Macomb County Register of Deeds on December 11, 2006. (ECF No. 21-9, PageID 329.) Otherwise, the terms of WB's 2006 Mortgage remained the same. (ECF No. 21-9, PageID 329.)

**January 2007 – October 2009: PNC receives NCB and NCMSC's mortgages on the Property.**

On January 9, 2007, NCMSC assigned its 2002 Mortgage on the Property to National City Mortgage Co. ("NCMC"). (ECF No. 22-4, PageID 677.) This assignment was recorded with the Macomb County Register of Deeds on January 24, 2007. (ECF No. 22-4, PageID 677.)

On October 1, 2008, NCMC merged into NCB. (ECF No. 22-6, PageID 718–20.) And on October 27, 2009, NCB merged into Plaintiff PNC Bank. (ECF No. 22-6, PageID 728.)

**April 2013: The Di Stefanos default on the 2002 loan from NCMSC.**

According to PNC, in April 2013, the Di Stefanos defaulted on the 2002 loan from NCMSC, which had been modified in January 2010. (ECF No. 22, PageID 639 (citing ECF No. 22-5, PageID 683); ECF No. 22-16, PageID 856–57.) Also according to PNC, "as of October 15, 2021, $339,495.83 is due and owing on" this loan. (ECF No. 22, PageID 639) (citing ECF No. 22-5, PageID 683).

**August 2013: PNC claims an interest in the Property based on NCMSC's 2002 Mortgage on it.**

On August 7, 2013, PNC filed a Claim of Interest on the Property based on the NCMSC's 2002 Mortgage on it. (ECF No. 22-14, PageID 817.) In this claim, PNC stated that "the Mortgage has not been satisfied and there remains an outstanding balance of approximately $193,939.48." (ECF No. 22-14, PageID 817.)

**October 2013: The Di Stefanos default on the 2003 loan from NCB.**

According to PNC, in October 2013, the Di Stefanos defaulted on the 2003 loan from NCB, and "[a]s of September 29, 2021, $41,236.66 is due and owing on" it. (ECF No. 22, PageID 639) (citing ECF No. 22-5).

**November 2013: PNC files an Affidavit of Erroneous Discharge of the 2002 Mortgage.**

On November 4, 2013, PNC filed an Affidavit claiming that the February 2003 Discharge of NCMSC's 2002 Mortgage was erroneous. (ECF No. 22-15.) In this Affidavit, PNC stated that the 2002 Mortgage had "not been satisfied" and

"declared" that "the Discharge . . . [was] hereby cancelled and null and void, and that the Mortgage . . . [was] reinstated." (ECF No. 22-15, PageID 820–21.)

**February 2011 – December 2013: SCA receives WB's mortgages on the Property.**

On February 14, 2011, the Federal Deposit Insurance Corporation, as receiver for WB, assigned WB's 2004 and 2006 Mortgages on the Property to North CRE Venture 2010-2, LLC (ECF No. 22-10, PageID 767–68, 770, 779–80, 782.) On December 13, 2013 North CRE sold these Mortgages to Defendant Select Commercial Assets, LLC ("SCA"). (ECF No. 21-11, PageID 380–91, 393–94; ECF No. 22-17, PageID 924.)

**September 2014: Di Stefano deeds the Property to SCA.**

On September 12, 2014, Joanne Di Stefano[3] deeded the Property to SCA in lieu of foreclosure and in partial satisfaction of her remaining liability to SCA based on the 2004 loan from WB. (ECF No. 22-11, PageID 792–93.) This deed was recorded by the Macomb County Treasurer on September 15, 2014. (ECF No. 22-11, PageID 792.)

According to PNC, since receiving the Property, "SCA has failed to pay taxes or insurance premiums for [it] and has refused to reimburse PNC for the same." (ECF No. 22, PageID 641.) PNC claims that it has "paid all taxes assessed to the Property

---

[3] Ercole Di Stefano passed away before this deed. (ECF No. 22-11.)

during the period of 2013 through 2017, in a total of $27,229.2[8], and further has

paid all insurance premiums since 2013 through the present, in a total amount of

$28,746.44." (ECF No. 22, PageID 641) (citing ECF No. 22-5).

**October 2014 – February 2016: The Macomb County Circuit Court denies PNC's claim to a senior interest in the Property based on NCMSC's 2002 Mortgage on it.**

On October 14, 2014, PNC filed a "Complaint to Quiet Title and Hold Discharge

/ Satisfaction of Mortgage Null and Void" in Macomb County Circuit Court against

the Di Stefanos, North CRE, SCA, and FCI Lender Services. (ECF No. 22-16.) PNC

asked the Macomb County Court to:

A. Enter an Order . . . that the recorded [January 2003] Satisfaction / Discharge . . . is/was Null and Void and that the [2002 NCMSC] Mortgage . . . be held to have been recorded and perfected on the date of its recording (November 25, 2002) and to have been in full force and effect from that date until such date as said Mortgage is, in fact, discharged or otherwise considered no longer enforceable or effective.

B. Enter an Order . . . that Quiets Title to the Subject Property in the name of the Defendants, Ercole Di Stefano and Joanne Di Stefano, husband and wife, and which declares that the [2002 NCMSC] Mortgage . . . is a valid perfected senior mortgage interest of record and holding that all other interests or mortgages of record, including those of the other named Defendants, be considered junior, inferior and subject to the senior Mortgage interest of Plaintiff as found in Paragraph 7, above.

C. Grant such other relief as may be appropriate.

8

(ECF No. 22-16, PageID 829.) In addition to NCMSC's 2002 Mortgage, the Complaint discussed the WB Mortgages. (ECF No. 22-16, PageID 826–27.) It did not mention the 2001 and 2003 HELOCs. (ECF No. 22-16.)

On December 30, 2015, the Macomb Court entered summary judgment for SCA. (ECF No. 22-17.) The Court held that PNC's Affidavit of Erroneous Discharge "was not effective" because the Michigan statute that authorizes that type of affidavit "does not provide for the perfection of a mortgage that was improperly discharged." (ECF No. 22-17, PageID 929.) Therefore, PNC's "[A]ffidavit failed to place SCA on notice of a legitimate right to the Property, and SCA qualifie[d] as a bona fide purchaser," free from NCMSC's 2002 Mortgage. (ECF No. 22-17, PageID 929.) The Macomb Court also declined to restore the mortgage in equity, because "SCA qualifie[d] as an innocent third party." (ECF No. 22-17, PageID 930.)

On February 16, 2016, after PNC moved for reconsideration, the Macomb Court affirmed its judgment on the merits. It also shut down PNC's attempt to raise new arguments based on NCMSC's 2001 Mortgage and the 2003 HELOC as follows:

> . . . PNC Bank's reliance on a prior 2001 Mortgage is misplaced. The U.S. Department of Housing and Urban Development closing statement . . . clearing shows the subject 2002 NCMSC Mortgage as paying off the prior 2001 NCMSC Mortgage.
>
> PNC Bank's complaint only sought an adjudication of its priority based on the 2002 NCMSC Mortgage. The *Opinion and Order* dated December 30, 2015 only resolved this issue. Moreover, PNC Bank has not proffered any evidence that any actual loan advances were made or remained unpaid under the Future Advance Mortgage granted by the Di

Stefanos to National City Bank on February 5, 2003 and recorded on March 20, 2003. Hence, PNC Bank did not establish—and still has not established—the Future Advance Mortgage remains a valid senior mortgage interest.

(ECF No. 22-18, PageID 935.)

## B. Procedural History

On March 1, 2018, PNC filed a Complaint against SCA and "All Occupants of [the Property]" ("Occupants") in this Court. (ECF No. 1.)

On May 15, 2018, PNC amended its Complaint. (ECF No. 10.) In its Amended Complaint, PNC requested: 1) "that the Court enter a Judgment of Foreclosure in favor of PNC, adjudging and ordering that PNC's mortgage interest in the Property be foreclosed, and the Property . . . be sold to the highest bidder pursuant to the applicable Michigan statute(s) and court rule(s), at public auction as one parcel"; and 2) "that the Court enter a Judgment in favor PNC, adjudging and ordering that SCA pay to PNC all amounts paid by PNC for real estate taxes assessed to the Property and hazard insurance for the Property since SCA took title thereto, and awarding PNC all other applicable relief." (ECF No. 10, PageID 121–26.)

SCA answered this Amended Complaint on June 15, 2018. (ECF No. 11.) Occupants never filed an answer and have played no role in this case.

SCA moved for summary judgment[4] on September 30, 2021, (ECF No. 21), and PNC moved for summary judgment on October 1, 2021, (ECF No. 22). They responded to each other's motions, and replied to these responses, between October 29, 2021 and November 19, 2021. (ECF Nos. 23, 24, 25, 26.)

## II. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense

---

[4] More specifically, SCA titled its filing: "MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1), or ALTERNATIVEY MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56." (ECF No. 21, PageID 220.) According to SCA, it invoked both standards because its motion is based on res judicata and "[i]t is unclear whether the Eastern District of Michigan views a *res judicata* defense as one properly raised under Fed. R. Civ. P. 56 or 12(b)(1)." (ECF No. 21, PageID 234.)

The Sixth Circuit and the District Court for the Eastern District of Michigan routinely evaluate *res judicata* defenses under the summary judgment standard. *See, e.g.*, *Raub v. Moon Lake Prop. Owners' Ass'n*, 718 F. App'x 407, 408 (6th Cir. 2018) ("Defendants are allowed to raise res judicata at summary judgment . . . ."); *Harris v. Ashley*, 165 F.3d 27 (6th Cir. 1998) (table) ("[W]e find that the district court was correct to grant summary judgment on the basis of *res judicata* . . . ."); *Fresh Start BVBA v. Jaffe Raitt Heuer & Weiss, PC*, No. 21-CV-10315, 2022 WL 722204, at *6 (E.D. Mich. Mar. 9, 2022) ("Since all three *res judicata* elements are met, Defendants are entitled to summary judgment."). This Opinion will do the same. !

asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000)

(internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III. ANALYSIS

### A. PNC's claims are not barred by res judicata.

"The doctrine of res judicata was judicially created in order to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Pierson Sand & Gravel, Inc. v. Keeler Brass Co.*, 430 Mich. 372, 380 (1999) (internal quotation marks omitted). Its application "presents a question of law." *Washington v. Sinai Hosp. of Greater Detroit*, 478 Mich. 412, 417 (2007); *see also Bates v. Twp. of Van Buren*, 459 F.3d 731, 734 (6th Cir. 2006) ("The application of res judicata is a question of law . . . .").

Here, SCA argues that "PNC's claims are barred [by res judicata] because they are based upon the same facts, issues, and evidence that were litigated – or which

could have been litigated – in the prior State Court Case." (ECF No. 21, PageID 235.) "The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which . . . directs a federal court to refer to the preclusion law of the State in which judgment was rendered." *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (citing 28 U.S.C. § 1738). Accordingly, the Court evaluates SCA's argument under Michigan's res judicata law.

Michigan has "taken a broad approach to the doctrine of res judicata." *Adair v. State*, 470 Mich. 105, 121 (2004). In Michigan, "the doctrine of res judicata . . . bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Id.*

"The burden of proving the applicability of . . . res judicata is on the party asserting it." *Baraga Cnty. v. State Tax Comm'n*, 466 Mich. 264, 269 (2002). The parties agree that SCA can establish the first two elements. *See* (ECF No. 21, PageID 236–37) (asserting that the first two elements are satisfied); (ECF No. 23) (ignoring the first two elements when responding to SCA's motion). But they disagree on the third.

The third res judicata element is satisfied "'if the evidence needed to sustain the second suit would have sustained the first, or if the same facts were essential to

maintain both actions.'" *Adair*, 470 Mich. at 124 (quoting *River Park, Inc. v. Highland Park*, 184 Ill.2d 290, 307 (1998)). It is also satisfied if the second suit "aris[es] from the same transaction" as did the first suit and "the parties, exercising reasonable diligence, could have raised [the second suit's claim(s) in the first suit,] but did not." *Id.* at 121. "Whether a factual grouping constitutes a transaction for purposes of res judicata is to be determined pragmatically, by considering whether the facts are related in *time, space, origin or motivation*, and whether they form a convenient trial unit." *Id.* at 125 (quoting 46 Am. Jur. 2d, Judgments 533, p. 801 (alterations omitted) (emphasis *Adair*'s)).

## Arguments

First, SCA argues that "there is no doubt that the 'matter' in this case 'was, or could have been, resolved in the' State Court Case" because the facts here "were all, or virtually all, part of the State Court Case." (ECF No. 21, PageID 237–38) (quoting *Adair*, 470 Mich. 105 and also citing *Burns v. Ocwen Loan Servicing, LLC*, No. 17-11748, 2017 WL 10751395 (E.D. Mich. Oct. 4, 2017), *report and recommendation adopted by* 2018 WL 851284 (Feb. 14, 2018)). To this point, SCA observes that the Macomb County Court rejected arguments that PNC made about "the alleged superiority of the 2001 Mortgage" and the 2003 HELOC in its Motion for Reconsideration. (ECF No. 21, PageID 239–40). And it asserts that "PNC's claim that it seeks different *relief* in this case . . . is not a basis for PNC to avoid" res

judicata, because "[i]n determining whether *res judicata* bars a second action, 'a comparison of the grounds asserted for relief is not a proper test.'" (ECF No. 21, PageID 238) (emphasis added) (quoting *Jones v. State Farm Mut. Auto Ins. Co.*, 202 Mich. App. 393, 401 (1993) and also citing *York v. Wayne Co. Sheriff*, 157 Mich. App. 417 (1987), among others).

Then, SCA argues that, "even if the State Court Case did not make any argument regarding the 2001 HELOC, 2003 HELOC or 2001 Mortgage, there is [] no credible question that PNC should have or could have raised these issues in that case." (ECF No. 21, PageID 240) (citing *Adair,* 470 Mich. 105). It contends that both cases arise out of "the priority of the parties['] respective mortgage interests in the Property," and that "PNC admits that all of [the] National City mortgages at issue were recorded against the Property at the time of the State case in 2014." (ECF No. 21, PageID 240–41.) It also notes that Michigan Court Rule 2.203(A) requires a party filing a pleading to "join every claim that the pleader has against that opposing party at the time of serving the pleading, if it arises out of the transaction or occurrence that is the subject matter of the action and does not require for its adjudication the presence of third parties over whom the court cannot acquire jurisdiction." (ECF No. 21, PageID 240.)

PNC responds that its "request for declaratory relief in the 2014 Quiet Title Action arose from, and was limited to, the erroneous Discharge of the 2002

Mortgage – a security instrument not at issue in this litigation[,] . . . which relates to . . . PNC's right to foreclose under the 2001 HELOC and 2003 HELOC."  (ECF No. 23, PageID 985.) It emphasizes that "the complaint in the 2014 Quiet Title Action did not even mention the separate and distinct loan transactions embodied in the 2001 or 2003 HELOCS, nor did it relate to or describe the Di Stefanos' payment obligations or status under the terms of the 2001 HELOC, 2002 Promissory Note, or 2003 HELOC, which give rise to PNC's instant claim for judicial foreclosure." (ECF No. 23, PageID 985–86) (citing *U.S. Bank v. Gorge*, No. 35418, 2021 WL 2493859 (Mich. Ct. App. June 17, 2021)). And it asserts that "the trial court made abundantly clear that neither the 2001 nor the 2003 HELOC was ever part of the 2014 case." (ECF No. 23, PageID 992.)

Further, PNC argues that "[t]here simply is no basis for SCA to say that the question before the Court in this action is whose mortgage(s) have priority, as the only issue relevant to PNC's claim for judicial foreclosure is whether an indebtedness, secured by a mortgage held by the foreclosing party, is in default." (ECF No. 23, PageID 990) (citing *U.S. Bank Trust, NA v. Bryden*, No. 324153, 2016 WL 555848, at *2 (Mich. Ct. App. Feb. 11, 2016)).

Additionally, PNC asserts that "the 2014 Quiet Title Action makes no mention of PNC's payment of any monies for property taxes or insurance premiums – which form the basis for PNC's claim for unjust enrichment in the instant case – as those

events largely took place well after the filing of the 2014 action." (ECF No. 23, PageID 986.)

SCA replies that "PNC's claim that this is really a different case or that it is seeking a different relief in this case . . . is not a true statement considering that 'priority' is a required element of the analysis that the Court must determine before it could grant the relief requested." (ECF No. 25, PageID 1442–43) (citing *Senters v. Ottawa Savings Bank*, 443 Mich. 45, 57 n.16 (1993)). It also argues that PNC's reliance on *Gorge* is misplaced, because "*Gorge* did NOT involve a determination of the priority of interests, and there was never a question that the bank could bring a later foreclosure action against *Gorge.*" (ECF No. 25, PageID 1443.)

**Analysis**

This case is not barred by res judicata.

To begin with, this case does not depend on the same facts and evidence as did the 2014 case. In this case, PNC asks the Court for two things: first, to order foreclosure of the Property under the 2001 and 2003 HELOCs; and second, to order SCA to repay taxes and insurance on the Property from September 2014, when SCA came to possess it. (ECF No. 10, PageID 121–26.) The former request requires PNC to demonstrate that the 2001 and/or 2003 HELOC(s) secured a debt that is now in default. *See* III.B, *infra*. The latter requires PNC to demonstrate that SCA breached the HELOCs by failing to pay taxes and insurance, resulting in damages to PNC. *See*

III.C., *infra*. Neither requires PNC to make any reference to the 2002 NCMSC Mortgage at all. (The former request involves the 2002 *loan* from NCMSC, but not the 2002 Mortgage. *See* III.B, *infra*.)

In contrast, PNC hinged its Macomb County case on the 2002 Mortgage. In that case, PNC asked the Macomb Court for two different things: first, to hold that the Discharge of the 2002 NCMSC Mortgage was null and void; and second, to "declare[] that the [2002 NCMSC] Mortgage . . . is a valid perfected senior mortgage interest of record and hold[] that all other interests or mortgages of record . . . be considered junior, inferior and subject to" it. (ECF No. 22-16, PageID 829.) The former request depended on the 2002 NCMSC Mortgage, the Discharge, and the Affidavit labelling the Discharge erroneous. The 2001 and 2003 HELOCs, and taxes and insurance paid for the Property since September 2014, had nothing to do with it.

The latter request depended on the terms, execution dates, and transfers of all "interests or mortgages" on the Property. Notably, PNC's Complaint did not mention the HELOCs once. (ECF No. 22-16.) But even if the Macomb Court did need to examine the HELOCs to verify that the 2002 Mortgage was senior to "all other interests or mortgages of record" in Macomb County, the Macomb Court still did not need to consider whether the HELOCs were in default. Neither did it need to consider the Property's post-September 2014 taxes and insurance to determine the 2002 Mortgage's priority.

Thus, this case and the Macomb County case do not depend on the "same evidence." *Cf. Burns*, 2017 WL 10751395, at *7 ("[T]he claims in this action arise from the same facts and require the same evidence as the prior state court action. . . . Thus, this factor is satisfied."); *York*, 157 Mich. App. at 155 ("proof of the same facts or evidence as required to sustain the previous action is necessary in this action").

Next, this case does not "aris[e] from the same transaction" as the Macomb County case did. *Adair*, 470 Mich. at 121. Both relate to the same space—the Property—and the same parties. But their meaningful connections end there. The cases' facts are mostly unrelated in origin, time, and motivation, and do not "form a convenient trial unit." *Id.* at 125.

Indeed, these cases have completely distinct origins. This case originates from the 2001 and 2003 HELOCs; the Macomb County case originates from the 2002 NCMSC Mortgage. (And again, while PNC argues that the 2001 HELOC secures the 2002 *loan* from NCMSC, it does not argue that the 2002 *mortgage* has any bearing on its current claims.)

These cases also zero in on different points in time. This case starts with the 2001 and 2003 HELOCs. It includes the 2002 loan. And it must take account of the October 2009 merger between NCB and PNC, (ECF No. 22-6, PageID 728), and the September 2014 deed of the Property from Di Stefano to SCA, (ECF No. 22-11,

PageID 792). But after that, this case focuses on the ongoing defaults on the 2002 and 2003 loans, which began on April 2013 and October 2013, respectively, and on SCA's failure to pay taxes on and insure the Property *since* September 2014.

The Macomb County case's time frame does overlap with that of this case. Because it concerned the 2002 NCMSC Mortgage's seniority as compared to all other interests on the Property, it implicated all of the other Mortgages, mergers, and assignments listed in this case: the 2001 NCMSC Mortgage, the 2001 and 2003 HELOCs, the 2004 and 2006 WB Mortgages, the January 2007 assignment of the 2002 Mortgage from NCMSC to NCMC, the October 2008 merger of NCMC into to NCB, the October 2009 merger of NCB into PNC, the February 2011 assignment of the WB Mortgages to North CRE, the December 2013 sale of the WB Mortgages to SCA, and the September 2014 deed of the Property to SCA.

But the Macomb County case primarily focused on the 2002 NCMSC Mortgage, and its validity in light of the January 2003 Discharge, the August 2013 Claim of Interest, and the November 2013 Affidavit labelling the Discharge erroneous, none of which factor in to this case. Additionally, the Macomb County case did not involve any facts that occurred after after SCA's procurement of the WB Mortgages in December 2013.

These cases have different motivations too. In this case, PNC seeks to foreclose on the Property to secure repayment of the 2001, 2002, and 2003 loans, based on the

terms of the 2001 and 2003 HELOCs. It also seeks to secure repayment of post-September 2014 taxes and insurance on the Property. It does not seek an adjudication of the priority of the interests on the Property. *See* III.B, *infra*.

In contrast, the Macomb Court quite clearly stated that the 2014 case "only . . . adjudicate[ed] [] [PNC's] priority based on the 2002 NCMSC Mortgage." (ECF No. 22-18, PageID 935.) That case was not motivated by a desire to vindicate the rights established by the 2001 and 2003 HELOCs. *Cf. Jones*, 202 Mich. App. at 399 ("Where 'more than one primary right of [the] plaintiff [has been] invaded, or if there has been more than one invasion of a single primary right,' res judicata will not bar the second suit." (quoting *Citizens Telephone Co. v. Anderson,* 291 S.W.2d 527, 528 (Ky.1956) and applying Kentucky res judicata law)). Nor was it motivated by a desire to address defaults on any loans, a desire to foreclose on the Property, or a desire to recoup taxes and insurance payments. *Cf. Gorge*, 2021 WL 2493859, at *6 ("The facts in the 2017 case centered around the *formation* of the mortgage . . . . By contrast, the present foreclosure action centers on defendant's *subsequent default* under the mortgage, including his failure to make monthly payments." (emphasis added)).

For the same reasons, these two cases do not form a particularly convenient trial unit. They share some background facts, but turn on separate legal and factual issues. So combining them would not save a dispositive amount of time or effort.

Therefore, the Court **DENIES** SCA's Motion for Summary Judgment on the grounds of res judicata. *Cf. Pierson Sand & Gravel, Inc.*, 460 Mich. at 383 ("The goal of res judicata is to promote fairness, not lighten the loads of the state court by precluding suits whenever possible.").

## B. PNC is entitled to foreclosure on the Property based on the 2003 HELOC.

In general, "[b]efore receiving a judgment of foreclosure, [a] mortgagee must prove that [a] debt exists and the amount of the debt. Additionally, the mortgagee must make a showing that the debt was in default." *Wilmington Sav. Fund Soc'y, FSB v. Kattula*, No. 16-CV-12813, 2018 WL 3599036, at *4 (E.D. Mich. July 27, 2018) (internal citation and quotation marks omitted) (citing *31800 Wick Rd. Holdings, LLC v. Future Lodging-Airport, Inc.*, 848 F. Supp. 2d 757, 763 (E.D. Mich. 2012) and *Select Commercial Assets, LLC. v. Carrothers*, No. 326968, 2016 WL 3419018, at *3 (Mich. Ct. App. June 21, 2016)); *see also Bryden*, 2016 WL 555848, at *2.

**Arguments**

PNC asserts that the following facts are undisputed: "the Di Stefanos granted the 2001 HELOC and 2003 HELOC"; "the 2001 HELOC secures repayment of '[a]ll future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract guaranty, or other evidence of debt'"; the 2001 HELOC provides that "[t]he duties and benefits of [it] shall bind and benefit

the successor and assigns of Mortgagor and Lender"; "PNC is the successor by mergers to [NCB] and [NCMSC]"; and "the Di Stefanos have defaulted on their loan repayment obligations under the 2002 Promissory Note and 2003 HELOC, and [] a collective $380,732.49 is currently due and owing on these loans." (ECF No. 22, PageID 645–46). "Accordingly," PNC concludes, it is "entitled to summary judgment of its affirmative claim for judicial foreclosure of the 2001 HELOC and 2003 HELOC." (ECF No. 22, PageID 646) (citing *Bryden*, 2016 WL 555848, at *2, M.C.R. 3.410(B)(2), Mich. Comp. Laws Ann. § 600.3115, and 12 U.S.C § 215a(e)).

SCA does not directly respond to this argument. Instead, SCA's response to PNC's Motion for Summary Judgment reiterates, almost verbatim, its previously-filed Motion for Summary Judgment on the grounds of res judicata. (It does also contain a short section on PNC's tax and insurance claim.)

However, within its res judicata arguments, SCA makes some points that are relevant to the merits of PNC's foreclosure claim. It argues that, to order foreclosure, the Court must first "determine[] . . . whether SCA's mortgage interests on the Property are superior to PNC's mortgage interests on the [] Property." (ECF No. 24, PageID 1034) (citing *Senters*, 443 Mich. at 57 n.16). It claims that PNC "is a junior interest holder, as determined by the state court," and thus "PNC's only interest in this property exists in the 'surplus proceeds', if any would exist after the debt to SCA is satisfied." (ECF No. 25, PageID 1444) (citing *In re $55,336.17 Surplus Funds*,

319 Mich. App. 501 (2017)). And it asserts that "any claim by PNC that SCA lost its superior senior interest in the Property when it executed the Deed-in-Lieu of Foreclosure [] fails" because the Deed "expressly and clearly provides that '[n]o merger of this mortgage and this fee is intended at this time.'" (ECF No. 24, PageID 1036) (quoting ECF No. 24-14).

PNC replies that "priority" has no "bearing on the straightforward legal elements of this foreclosure action." (ECF No. 26, PageID 1450.) Further, it adds that "the law is long-settled and clear under Michigan's race-notice statute that an earlier-recorded security interest holds priority over a later-recorded one." (ECF No. 26, PageID 1454) (citing Mich. Comp. Laws Ann. § 565.29).

**Analysis**

PNC is entitled to foreclose on the Property through the 2003 HELOC, because that HELOC secures the 2003 loan of $44,000 from NCB to the Di Stefanos, and that loan is in default. However, PNC is not entitled to foreclose on the Property through the 2001 HELOC, because that HELOC does not secure the 2002 loan and PNC has not produced any evidence that the 2001 loan is in default.

First, PNC has proven that in 2001 and 2003, the Di Stefanos granted HELOCs on the Property to secure loans from NCB. *See* (ECF No. 22-2; ECF No. 22-7). It has also proven that it currently holds NCB's interests in these HELOCs, by way of merger. *See* (ECF No. 22-6) (NCB merges with PNC); (ECF No. 22-2, PageID 663)

(providing that the 2001 HELOC would "bind and benefits the successors and assigns of [the Di Stefanos] and [NCB]"); (ECF No. 22-7, PageID 736) (same, for the 2003 HELOC); *see also* 12 U.S.C. § 215a(e) (providing that, in the "[m]erger of national banks or State banks into national banks," "[t]he receiving association, . . . shall hold and enjoy all rights of property, franchises, and interests . . . in the same manner and to the same extent as such rights, franchises, and interests were held or enjoyed by any one of the merging banks or banking associations at the time of the merger, subject to the conditions hereinafter provided"); (ECF No. 10, PageID 120) (characterizing PNC as "a *national* banking association" (emphasis added)). SCA does not dispute these facts. *Cf.* (ECF No. 24, PageID 1034) (assuming that PNC has "mortgage interests on the [] Property").

Second, PNC has proven that the 2001 HELOC secured an initial loan of $45,000 from NCB to the Di Stefanos, (ECF No. 22-2, PageID 660), that the 2003 HELOC secured an initial loan of $44,000 from NCB to the Di Stefanos, (ECF No. 22-7, PageID 733), and that both HELOCs secured "[a]ll future advances from [NCB] to [the Di Stefanos] or other future obligations of [the Di Stefanos] to [NCB] under any promissory note, contract, guaranty, or other evidence of debt executed by [NCB] in

favor of [the Di Stefanos] executed" after each HELOC. (ECF No. 22-2, PageID 661; ECF N. 22-7, PageID 734).[5] SCA does not dispute these facts either.

But PNC cannot prove that the 2001 HELOC secured the 2002 loan from NCMSC to the Di Stefanos.[6] The 2001 HELOC secured "[a]ll future advances from [NCB] to [the Di Stefanos]," (ECF No. 22-2, PageID 661), and provided that the "duties and benefits" that it created would "bind and benefit[] the successors and assigns of [the Di Stefanos] and [NCB]." (ECF No. 22-2, PageID 661, 663.). But when NCMSC made the 2002 loan it was a separate entity from NCB—and not yet a "successor [or] assign" of it.[7] Therefore, this loan did not create any "duties [or] benefits" under the 2001 HELOC.

Third, PNC has proven that the Di Stefanos have defaulted on the 2003 loan from NCB. It has done so by producing an Affidavit from Thomas Morris, "an Officer[] and Senior Default Litigation Specialist" at PNC, that states, in relevant part:

> 12. The Di Stefanos failed to make the payment due under the 2003 HELOC beginning in October 2013 and each month thereafter, and are in default of their loan repayment obligations under the 2003 HELOC.

---

[5] By these terms, the 2001 HELOC also secured the 2003 loan. But because PNC never makes this point, and this point would not affect the outcome of this case anyway, the Court need not consider it further.

[6] PNC emphasizes that the 2002 Mortgage that secured this loan is "not at issue in this litigation." (ECF No. 23, PageID 985.) It also does not argue that the 2003 HELOC secured this loan, presumably because the loan preceded that HELOC.

[7] The Court need not decide whether the 2001 HELOC would have secured a loan made from NCMSC *after* it became a successor to NCB.

13. As of September 29, 2021, $41,236.66 is due and owing on the 2003 HELOC.[8]

. . .

17. The amount stated herein are based on my review of the records contained in Mortgage Services Package ('MSP'). I use records from MSP to confirm the amounts due and rely on such records in my daily work activity. In addition, the amounts stated herein are based on my review of records from the Online Computer Information Exchange ('OCIE'), which contains certain archieved records from MSP that are older than twenty-four months from the date of my review. I also rely on the OCIE records in my daily work activity.

18. PNC uses MSP to automatically record and track mortgage payments. This type of record-keeping system is recognized as standard in the industry. . . .

. . .

19. . . . [M]y review of PNC's business records gives me no reason to believe that the process for tracking and recording payments worked improperly with respect to the . . . 2001 or 2003 HELOCs."

(ECF No. 22-5, PageID 680, 684–86). Because SCA has not challenged this Affidavit,[9] it is sufficient to establish the default. *C.f. Kattula*, 2018 WL 3599036, at *5 ("[P]laintiff introduced no admissible evidence regarding the current status of the

---

[8] Although this Affidavit does not identify the specific loan that the Di Stefanos failed to repay, the record makes clear that the loan at issue must be the 2003 loan from NCB.

[9] The only time SCA references this issue is when it states that, "[a]s of at least April 2013 the DiStefano's were *allegedly* in default of the 2003 National City HELOC." (ECF No. 24, PageID 1026) (emphasis added). This is not an admission, but it is not a denial either.

loan in question. . . . Plaintiff failed to meet its burden of proof regarding a showing that the loan is in default.").

Accordingly, the Court **GRANTS** PNC's Motion for Summary Judgment on its claim for foreclosure of the Property through the 2003 HELOC to secure repayment of the $41,236.66 (plus interest accrued since September 29, 2021) due on the defaulted 2003 loan. *C.f. Bryden*, 2016 WL 555848, at * 2 (". . . U.S. Bank met its initial burden of proof demonstrating entitlement to judicial foreclosure by presenting . . . a copy of (1) the mortgage, evidencing defendants as mortgagors, (2) the mortgage assignments and modification agreement, evidencing U.S. Bank as the mortgagee, and (3) the notice of indebtedness sent to defendants and defendants' answers to plaintiff's first interrogatories, evidencing that defendants defaulted on the loan.").

On the other hand, PNC has not offered any evidence that the 2001 loan from NCB is in default. And, as discussed, the 2001 HELOC did not secure the 2002 loan. Therefore, no jury could rule for PNC on its claim for foreclosure through the 2001 HELOC. Accordingly, given that the parties have fully briefed this issue, the Court **GRANTS** SCA's Motion for Summary Judgment on this claim. *See* Fed. R. Civ. Pro. 56(f)(2) ("After giving notice and a reasonable time to respond, the court may: . . . grant the motion on grounds not raised by a party . . . .").

The Court also notes that the priority of SCA and PNC's interests have no bearing on these determinations. SCA points out that in *Senters* the Michigan Supreme Court acknowledged, in a footnote, that the author of a Michigan property law treatise has "caution[ed] lenders to order a title report before a foreclosure sale by advertisement." (ECF No. 24, PageID 1034); *Senters*, 443 Mich. at 57 n.16 (citing 1 Cameron, Michigan Real Property Law: Principles and Commentary, § 18.80, p. 648). But this case does not involve a foreclosure sale *by advertisement*. And even if it did, *Senters* does not hold that a party *must* ask the Court to determine the priority of interests before such a foreclosure.

Importantly, SCA's rights will not be vitiated by the foreclosure ordered here. If SCA has a mortgage interest senior to PNC's, then SCA will still be entitled to foreclose on the property to recoup that interest at a later date. Alternatively, if it has a junior interest, then it can assert its right to redeem any surplus funds during PNC's foreclosure proceedings. *See In re $55,336.17 Surplus Funds*, 319 Mich. App. at 509 ("[T]he foreclosure of a senior mortgage extinguishes the lien of a junior mortgagee where the junior mortgagee does not exercise its right to redeem. . . . However, after the sale of property, there is a statutory period during which a junior mortgagee, amongst others, has a right to redeem the property."); *Fed. Home Loan Mortg. Corp. v. Werme*, 335 Mich. App. 461, 482 (2021) ("Ordinarily, the foreclosure of a junior mortgage does not impact the senior mortgagee's rights because the senior mortgage

rides through the foreclosure and the junior mortgagee takes the property subject to the senior mortgage.").

**C. PNC is entitled to reimbursement for the taxes it paid on the Property since September 2014, but not for any insurance it acquired for the Property.**

"The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another." *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 194 (2006). Under Michigan law, a plaintiff may "sustain a claim of quantum meruit or unjust enrichment" by establishing "(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Id.* at 195.

"'However, a contract will be implied only if there is no express contract covering the same subject matter.'" *Id.* at 194 (quoting *Belle Isle Grill Corp. v. Detroit,* 256 Mich. App. 463, 478 (2003)). In other words, "'[g]enerally, an implied contract may not be found if there is an express contract between the same parties on the same subject matter.'" *Id.* (quoting 42 CJS, Implied and Constructive Contracts, § 34, p. 33) (emphasis removed).

**Arguments**

PNC asserts that there is no "dispute that since September 12, 2014, SCA has owned the Property, and therefore, as a matter of Michigan law, has been the party legally responsible for payment of property taxes assessed thereon." (ECF No. 22,

31

PageID 648) (citing Mich. Comp. Laws Ann. § 211.3). It also observes that "under the terms of the 2001 HELOC and 2003 HELOC, PNC was authorized to advance monies for property taxes and hazard insurance to protect PNC's interest in the Property." (ECF No. 22, PageID 648) (citing ECF Nos. 22-2, 22-7).

PNC maintains that "there is no dispute that since the Di Stefanos defaulted on their loan repayment obligations in 2013, PNC has paid real estate taxes assessed on the Property, in the amount of $27,229.2[8], and further paid approximately $28,746.44 for hazard insurance to protect the Property from loss." (ECF No. 22, PageID 648). And it argues that "SCA has benefitted by these payments by PNC, in that (i) these payments have protected SCA's respective interests in the Property; and (ii) SCA was the party legally responsible for making such payments from the time it owned the Property." (ECF No. 22, PageID 648.) "It would be inequitable," PNC concludes, "to permit SCA to retain these benefits without paying PNC." (ECF No. 22, PageID 648)

In response, SCA "acknowledges and agrees that Plaintiff paid property taxes on the subject property." (ECF No. 24, PageID 1039.) It also states that it "never requested nor was aware that property taxes were being paid by" PNC, but "to the extent P[NC] paid and can prove payment of those property taxes, [SCA] has always agreed . . . it would reimburse PNC for those taxes." (ECF No. 24, PageID 1039);

*see also* (ECF No. 25, PageID 1442) (stating that "SCA has not sought to 'retain' any benefit from PNC" and "asked PNC to stop making tax payments").

SCA then argues that PNC's "claim for unjust enrichment as to casualty insurance must be denied." (ECF No. 24, PageID 1039.) It asserts that it "maintained its own casualty insurance on the property at all times" and "never requested, or was aware, that PNC was maintaining casualty insurance on the property." (ECF No. 24, PageID 1039.). Further, SCA contends that, because "the property insurance maintained by PNC named only itself as the beneficiary," SCA "never in any way benefited from . . . such insurance." (ECF No. 24, PageID 1040.)

Additionally, in its Reply to its own Motion for Summary Judgment, SCA emphasizes that "[t]he law will not imply a contract where a party (PNC) fails to mitigate its damages and has unclean hands." (ECF No. 25, PageID 1441–42) (citing *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521 (1991), *Martin v. East Lansing School District*, 193 Mich. App. 166 (1992), and *Pamar Enterprises, Inc. v. Huntington Banks*, 228 Mich. App. 727 (1998)).

PNC replies that "SCA offers no evidence, whatsoever, that it purchased its own insurance for the property" and thus "the Court should not consider this argument." (ECF No. 26, PageID 1455) (citing *Anderson*, 477 U.S. at 249 and Fed. R. Civ. Pro. 56(c)(1)). Further, it argues that, "had a claim been made" on the casualty insurance, "and PNC been paid the proceeds, under the terms of both the 2001 and 2003

HELOCs, these monies would have been used to either: (1) pay down (or pay off) the indebtedness secured by PNC's lien interests in the Property; or (2) repair damage to the Property," and "SCA would have benefited in either event." (ECF No. 26, PageID 1456) (citing *Dargis v. Boss*, No. 273473, 2008 WL 4228350, at *3 (Mich. Ct. App. Sept. 16, 2008) and *Coveyou Meadows Property Owners Association v. Coveyou*, No. 204778, 1999 WL 33453955, at *7 (Mich. Ct. App. Feb. 23, 1999)).

**Analysis**

The Court **DENIES** PNC's unjust enrichment theory because the undisputed facts demonstrate that the 2001 and 2003 HELOCs are express contracts that bind these parties and cover the transactions at issue within this claim. *See Morris Pumps*, 273 Mich. App. at 194.

However, the Court will consider PNC's claims here on the more appropriate grounds: breach of contract. *See* Fed. R. Civ. Pro. 56(f)(2). The parties' briefs already address the factual issues relevant to these grounds.

"Under Michigan law, promissory notes, mortgages, and guaranties are to be construed as ordinary contracts. When contract terms are unambiguous, the contract is to be enforced as written and the construction is a question of law." *31800 Wick Rd. Holdings, LLC*, 848 F. Supp. 2d at 763 (internal citations omitted).

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161, 178 (2014). "The causation element requires that the party show 'a causal link between the asserted breach of contract and the claimed damages.'" *Yaghnam v. Doe*, No. 353547, 2021 WL 3009756, at *2 (Mich. Ct. App. July 15, 2021) (quoting *Gorman v. American Honda Motor Co.*, 302 Mich. App. 113, 118–19 (2013)).

Here, the 2001 and 2003 HELOCs provide, in relevant part:

> **8. CLAIMS AGAINST TITLE**. Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assessing to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.
>
> . . .
>
> **11. AUTHORITY TO PERFORM**. If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in

a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

. . .

**16. EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expense. This Security Instrument shall remain in effect until released.

. . .

**19. INSURANCE.** Mortgagor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.
. . .
Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from

damage to the Property before acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

. . .

**22. JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** . . . The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

(ECF No. 22-2, PageID 660–63; ECF No. 22-7, PageID 734–36.)

First, both parties have affirmed that these contracts exist by producing them. *See* (ECF Nos. 21-3, 21-6, 22-2, 22-7).

Second, PNC has proven that SCA breached these contracts by failing to pay taxes on the Property. PNC has done this by demonstrating: that paragraphs 8 and 22 of the HELOCs require the Di Stefano's assigns to pay the Property's taxes, (ECF No. 22-2, PageID 660–63); that SCA became the Di Stefano's assign on September 12, 2014, when they deeded it the Property, (ECF No. 22-11); and that PNC "has paid real estate taxes assessed on the Property" "*[s]ince* December 2013," (ECF No. 22-5, PageID 684) (emphasis added). (Because real estate taxes are paid only once, the Court assumes that any such taxes paid by PNC were not paid by SCA.) SCA has not contested these points.

On the other hand, PNC has not proven that SCA breached the contracts' policies on insuring the Property. PNC *has* demonstrated that paragraphs 19 and 22 of the HELOCs require the Di Stefano's assigns to pay for insurance on the Property,

among other things, (ECF No. 22-2, PageID 662–63), and that, as noted above, SCA

became the Di Stefano's assign on September 12, 2014, (ECF No. 22-11). But it has

not demonstrated that SCA has ever failed to pay for insurance on the Property.

While PNC has offered undisputed evidence that "it has paid hazard insurance

premiums for the Property" "[s]ince August 2013" (ECF No. 22-5, PageID 684),

insurance, unlike taxes, can be paid multiple times—that is, different parties can pay

for different insurance plans on a property. And after months of discovery, PNC has

not provided any evidence that SCA has not paid for concurrent insurance on the

Property since September 2014.[10] Indeed, PNC does not even allege that SCA failed

to pay for insurance on the Property within its unjust enrichment argument, even

though that fact would have strengthened its original claim.[11] *See* (ECF No. 22,

PageID 647–48.)

   PNC's briefing does not suggest that SCA violated the HELOCs' insurance

requirements in any other way either.[12] Therefore, the Court **GRANTS** SCA

---

[10] SCA also asserted that it has insured the Property. (ECF No. 24, PageID 1039.)
But because SCA offers no evidence to support this assertion, the Court has not
considered it. *See* Fed. R. Civ. Pro. 56(e).

[11] PNC does state that "SCA has failed to pay . . . insurance premiums for the
Property" within its Statement of Facts, but it provides no citation for that statement.

[12] To the extent that PNC could have argued that SCA breached other, more
ambiguous insurance-related provisions of the HELOCs, these arguments have been
waived. The Court has exercised its discretion to assess whether PNC's briefing has
clearly established a breach of contract violation, but it need not and cannot make
new arguments for PNC.

summary judgment on PNC'S claim for reimbursement of the money it has spent to insure the Property. Fed. R. Civ. Pro. 56(f)(2).

Third, PNC has proven that it was damaged by SCA's failure to pay taxes on the Property. PNC has provided undisputed evidence that, "[s]ince December 2013, [it] has paid real estate taxes assessed on the Property in the amount of $27,229.28." (ECF No. 22-5, PageID 684) (emphasis added), which payment was authorized by paragraph 11 of the HELOCs, (ECF No. 22-2, PageID 661), and made "[t]o protect [PNC's] security interests in the Property" in light of SCA's breach, (ECF No. 22-5, PageID 684).

Accordingly, the Court **GRANTS** PNC summary judgment on its claim for SCA to reimburse it for the Property's real estate taxes. Fed. R. Civ. Pro. 56(f)(2). But PNC is only entitled for reimbursement of the taxes it has paid since September 12, 2014, and the cost of these taxes is not conclusively established by the briefing before the Court. Therefore, the Court **ORDERS** the parties to file a joint agreement on the amount of money SCA owes for these taxes within **30 days** of this Order. If the parties cannot agree on the amount, they may instead file separate briefs on the sole issue of how much money PNC has spent on taxes for the Property since September 12, 2014.

**CONCLUSION**

The Court **DENIES** SCA summary judgment on the grounds of res judicata. The Court **GRANTS** PNC summary judgment on its claim for foreclosure, but only through the 2003 HELOC, as described above. The Court **GRANTS** SCA summary judgment on PNC's claims for foreclosure on all other grounds. The Court **GRANTS** PNC summary judgment on its claim for SCA to reimburse it for the taxes it has paid on the Property since September 12, 2014. And finally, the Court **GRANTS** SCA summary judgment on PNC's claim for reimbursement of the money it has spent to insure the Property.

**IT IS SO ORDERED.**

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: May 20, 2022

40